UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jean-Loic Selo,

       Petitioner,

v.                                   Case No. 12-14251

Dawn Selo, a/k/a Dawn Michele Levites,      Honorable Sean F. Cox

       Respondent.

_____/

**OPINION & ORDER**

     Petitioner / Father filed this action against Respondent / Mother on September 25, 2012, seeking immediate return of the couple's minor child to Switzerland, under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*. Petitioner contends that Respondent's retention of the child in the United States is wrongful under the Hague Convention because Switzerland was the site of the child's habitual residence prior to the time of the wrongful retention, and he seeks an order returning the child to Switzerland. This Court held an evidentiary hearing on February 28, 2013, and heard closing remarks from Counsel on March 1, 2013. As explained below, the Court finds that Petitioner has not established a prima facie case of wrongful retention under the Convention because the retention of JPS in the United States by Respondent did not begin until August 15, 2012, and, by that time, the child's habitual residence had been altered to the United States. The Court must therefore DENY the Petition.

1

## BACKGROUND

Petitioner / Father Jean-Loic Selo ("Mr. Selo") filed this action against Respondent / Mother Dawn Michelle Levites Selo ("Mrs. Selo") on September 25, 2012, seeking immediate return of the couple's minor child, J.P.S., to Switzerland, under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*.  Mr. Selo contends that Mrs. Selo's retention of JP. in the United States is wrongful under the Hague Convention because Switzerland was the site of the child's habitual residence prior to the time of the wrongful retention, and he seeks an order returning JPS to Switzerland.

On October 2, 2012, this Court held a Status Conference.  At that conference, the parties agreed that an evidentiary hearing is needed so that this Court can hear and determine the merits of the Petition.  The parties also agreed on the date for the evidentiary hearing.  Thus, the Court originally scheduled the evidentiary hearing for November 14, 2012.

At the request of the parties, however, the evidentiary hearing was adjourned until February 28, 2013.  The Court ordered the parties to file witness lists, exhibit lists, and a joint statement of undisputed facts prior to the evidentiary hearing.

## GENERAL OVERVIEW OF GOVERNING LAW

The Hague Convention seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Maynard v. Maynard*, 484 F.Supp.2d 654, 658 (E.D. Mich. 2007).  A "primary purpose of the Convention is to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich*

*v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*"). "Additionally, according to the official commentary on the Hague Convention, the Convention should be read to prevent a circumstance where 'the child is taken out of the family and social environment in which its life has developed.'" *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007) (quoting Elisa Perez-Vera, Explanatory Report ¶ 12, in 3 *Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction* 1069 (1982)).

"When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered." *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007).

Under the Hague Convention, as implemented by the United States Congress in the International Child Abduction Remedies Act, children who are wrongfully removed or retained within the meaning of the convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies. Under Article 3 of the Hague Convention, the removal or retention of a child is "wrongful" where:

> a) it is a breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal of retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in subparagraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of agreement having legal effect under the law of that state.

Hague Convention, Article 3; *see also Friedrich I*, 983 F.3d at 1400.

The Petitioner has the burden of showing by a preponderance of the evidence that the removal or retention was wrongful.  *Friedrich I,* 983 F.3d at 1400.

If the Petitioner meets that burden, the burden shifts to the Respondent to show that one of the following narrow exceptions applies such that the child should not be returned:

1)    that the removal proceeding was commenced more than one year after the removal and the child has become settled in the new environment.  Hague Convention, Article 12;

2)    the Petitioner had consented or acquiesced in the removal or retention.  Hague Convention, Article 13a;

3)    there is a grave risk that return of the child would expose the child to physical or psychological harm.  Hague Convention, Article 13b;

4)    returning the child would violate fundamental principles relating to the protection of human rights and fundamental freedoms.  Hague Convention, Article 13b; or

5)    the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of his or her views.  Hague Convention, Article 13b.

Hague Convention, Articles 12, 13a, and 13b; *Friedrich I*, 983 F.3d at 1400.

## EVIDENTIARY HEARING

This Court held an evidentiary hearing in this matter on February 28, 2013, and heard closing arguments from Counsel on March 1, 2013.

The following witnesses testified at the evidentiary hearing: 1) Mr. Selo; 2) Madeleine Selo (Mr. Selo's mother, the paternal grandmother of JPS); 3) Mrs. Selo; and 4) David Levites (Mrs. Selo's father, the maternal grandfather of JPS).  Several exhibits were also admitted during the evidentiary hearing.

4

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the exhibits submitted by the parties, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

On February 21, 2013, the parties filed a Joint Stipulation of Facts. (Docket Entry No. 35). The Court will identify all stipulated facts as such below. All other facts are as determined by the Court, after consideration of the testimony and exhibits presented at the evidentiary hearing, drawing inferences as appropriate, weighing the evidence and assessing the credibility of the witnesses.

Mr. Selo is currently 42 years old. (Jt. Stip. Facts at ¶ 1). Mr. Selo is a citizen of France.

Mrs. Selo is 38 years old. (Jt. Stip. Facts at ¶ 2). Mrs. Selo has dual citizenship and is a citizen of both the United States and France.

Mr. Selo and Mrs. Selo were married in France on December 20, 1997. (Jt. Stip. Facts at ¶ 3). The parties have one minor child, JPS, who was born in France in 2001. (Jt. Stip. Facts at ¶ 4). JPS also has dual citizenship and is a citizen of both the United States and France.

JPS was discovered to have a coarctation of the aorta at the age of two; he had surgery to repair the coarcation in France within weeks of this discovery; he had a recoarctation at age seven. (Jt. Stip. Facts at ¶ 5). JPS was seen by his French cardiologist, Dr. Wernert, in

---

[1]To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

Marseille, France before and after his surgery.  Follow-up appointments were at ages 3, 4, and 7 years.  (Jt. Stip. Facts at ¶ 6).

Prior to 2007, the Selo family had lived together at different residences in both Switzerland and France.  Mr. and Mrs. Selo both knew that Mrs. Selo was unhappy living in Europe because she felt isolated and because she missed her family members who were in the United States.

On or about April 1, 2007, Mr. Selo, Mrs. Selo, and JPS moved from France to the martial residence in Switzerland.  (Jt. Stip. Facts at ¶ 7).  In 2008, JPS was enrolled in Conlara School's Home education program in Switzerland.  (Jt. Stip. Facts at ¶ 8).  Mrs. Selo served as JPS's instructor.

Prior to 2011, Mrs. Selo had made several trips to the United States with JPS, to visit her family.  Mr. Selo understood that it was important for Mrs. Selo to visit her family and he consented to those trips.  Prior to 2011, the longest such trip to the United States that Mrs. Selo and JPS had taken was for two to three months.

During the time period from 2010 to 2011, Mrs. Selo was unhappy in the marriage.  Mrs. Selo believed that Mr. Selo was emotionally abusive toward her and was controlling in the relationship.

Prior to the February 2011, trip, Mr. and Mrs. Selo had agreed to list the martial residence in Switzerland for sale.  They desired to sell the residence for a good price, so that they could ultimately use those funds to move to the United States at some point in the future.  There were no immediate or definite plans to do so, however, because Mr. Selo was going to have to work in France for at least another year.

Mrs. Selo and JPS left Switzerland on February 13, 2011. (Jt. Stip. Facts at ¶ 9).  At that time, JPS was habitually resident in Switzerland.  (Jt. Stip. Facts at ¶ 13).  The purpose of the trip was to visit Mrs. Selo's family.  (Jt. Stip. Facts at ¶ 10).  Mr. Selo took them to the airport.  They took two suitcases and a backpack with them.  Mrs. Selo and JPS had round-trip tickets for the flight.  (Jt. Stip. Facts at ¶ 14).  The trip was projected to last for about two months, or until April 29, 2011.  (Jt. Stip. Facts at ¶ 11).  Mr. Selo consented to the trip.  (Jt. Stip. Facts at ¶ 12).

After arriving in the United States, Mrs. Selo and JPS stayed at the home of her parents, David and Karen Levites, in Brighton, Michigan.

When she arrived in the United States, Mrs. Selo was confused and unsure about her marriage.  Mrs. Selo began receiving counseling.

Soon after they arrived here, Mrs. Selo enrolled JPS in a home-schooling program through a local organization.  Through that organization, JPS has participated in a home-school co-op program where he spends time attending classes at the organization and engages with other children in the program.  He also participates in a theater program.  Although Mrs. Selo serves as JPS's primary instructor, JPS also has a tutor in Michigan.  JPS has been speaking English, and writing in English, since arriving in the United States.

Mrs. Selo and JPS were scheduled to return to Switzerland on April 29, 2011.  On April 12, 2011, however, Mrs. Selo postponed their return to Switzerland.  (Jt. Stip. Facts at ¶ 15).  She did so via an e-mail to Mr. Selo, stating that there were two reasons for her extending the trip.  (Pet.'s Ex. 7).  First, she thought it would be easier to show and keep the marital residence clean if she and JPS were not living in the house.  Second, Mrs. Selo wanted to attend her sister's graduation ceremony in the United States.  Although she did not share this with Mr. Selo, Mrs.

Selo also wished to remain in the United States so that she could continue counseling and further assess the marriage.

Mr. Selo was disappointed that Mrs. Selo wanted to postpone their return, but agreed that she could do so.

Postponing their return meant that JPS would miss his next check-up appointment with his cardiologist in Europe. Mrs. Selo therefore sought out a cardiologist at the University of Michigan Hospital in Ann Arbor, Michigan. JPS was seen at the University of Michigan, C.S. Mott, Pediatric Cardiology in April 2011. (Jt. Stip. Facts at ¶ 16). His cardiologist there is Dr. Cotts. (Jt. Stip. Facts at ¶ 17).

On June 28, 2011, Mrs. Selo confirmed with Mr. Selo that she had a return flight booked for herself and JPS with arrival in Switzerland to be on July 7, 2011. (Jt. Stip. Facts at ¶ 17). On July 5, 2011, however, Mrs. Selo informed Mr. Selo that she was delaying their July 7, 2011, return. (Jt. Stip. Facts at ¶ 18). Mrs. Selo told Mr. Selo that she and JPS would return and arrive in Switzerland on August 28, 2011. (Jt. Stip. Facts at ¶ 19).

During the July 5, 2011, conversation, Mrs. Selo told her husband that she had started therapy in the United States. She told him it was something that was long overdue. She stated that she needed to work on her self-esteem and also wanted to work on communication problems in the marriage. Mrs. Selo also suggested that Mr. Selo see a therapist in Switzerland.

After that conversation, Mr. Selo found a therapist, that Mrs. Selo approved of, and began therapy in Switzerland.

On August 26, 2011, Mrs. Selo told Mr. Selo that she and JPS would not return on August 28, 2011. (Jt. Stip. Facts at ¶ 20). On that date, Mr. and Mrs. Selo had a long

conversation via skype.  Mrs. Selo told Mr. Selo that she and JPS would not be returning on

August 28, 2011, as planned, and she did not know when they would return.  She told Mr. Selo

that her therapists had helped her realize that this was not a good time for her to return to

Switzerland. Mrs. Selo stated that she wished to remain in the United States and continue

counseling.  She told Mr. Selo that she thought it would be best if Mr. Selo remained in

Switzerland and continued receiving counseling there.

Mr. Selo responded that he too wanted to work on making the marriage work.  He told

Mrs. Selo that he would continue therapy in Switzerland and would keep her informed about his

progress.

On August 27, 2011, Mr. and Mrs. Selo agreed that Mrs. Selo and JPS would remain in

the United States for an undefined period of time, while the couple lived apart and separately

received counseling.

In November of 2011, Mr. and Mrs. Selo and JPS went to Las Vegas, Nevada, along with

Mrs. Selo's parents.  Mrs. Selo, JPS, and Mrs. Selo's parents stayed together in one hotel while

Mr. Selo stayed at another hotel.  At the conclusion of the trip, Mr. Selo flew back to Switzerland

and Mrs. Selo and JPS returned back to Brighton, Michigan.

Mr. and Mrs. Selo continued seeing their respective therapists and discussing the state of

their marriage.

In December of 2011, Mr. Selo came to the United States to visit JPS for approximately a

week. Mr. Selo stayed at a nearby hotel.

In April of 2012, JPS saw Dr. Cotts again at the University of Michigan Hospital.  (Jt.

Stip. Facts at ¶ 16).

9

By April of 2012, Mrs. Selo had decided that she wanted to proceed from a separation to a divorce. Mrs. Selo signed a Complaint for Divorce, and collateral documents required for a divorce in Livingston County, Michigan on April 24, 2012; these were filed with the court on April 25, 2012. (Jt. Stip. Facts at ¶ 23). Mr. Selo, however, was not aware of the filing at that time.

Mr. and Mrs. Selo continued seeing their respective therapists and discussing the state of their marriage.

In June of 2012, JPS saw Dr. Cotts again in Ann Arbor, Michigan for an appointment for a cardiac MRI. (Jt. Stip. Facts at ¶ 16).

Between December of 2011, and August of 2012, JPS did not see Mr. Selo in person. During that time period, Mr. Selo communicated with JPS via text, telephone, and skype.

The next time that Mr. Selo came to the United States was on August 14, 2012. Mr. Selo had spoken with JPS via skype the day prior, August 13, 2012, and Mr. Selo thought that JPS seemed upset during the call. Mr. Selo then booked a flight to the United States. Mr. Selo arrived at Mrs. Selo's parents house in Brighton, Michigan on August 14, 2012. Mr. Selo did not advise Mrs. Selo that he was coming.

When he arrived at the house on August 14, 2012, Mr. Selo was greeted by Mrs. Selo's father, David Levites. Mr. Levites told Mr. Selo that Mrs. Selo was not home but that JPS was home. Mr. Selo then went upstairs, to JPS's bedroom, and played with JPS.

JPS's bedroom at the Brighton, Michigan home is a typical bedroom of a child his age. That is, his bedroom contains a bed and other furniture, including a desk. It also contains a television, a computer, JPS's DVDs and other possessions, and his toys. The walls of JPS's

10

bedroom are decorated with various posters that he has chosen.

When Mrs. Selo arrived back at the house on August 14, 2012, she did not speak to Mr. Selo in person.  Rather, Mr. Levites handed Mr. Selo a cellular telephone and Mrs. Selo spoke to him on the telephone, telling him that it was late and that he should find a hotel for the night. Mr. Selo then went to a nearby hotel.

The next day, August 15, 2012, Mr. Selo went back to the house but no one answered the door.  Mr. Selo then called the local police because he believed that JPS may have been kidnaped by Mrs. Selo.  Mr. Selo asked the police to contact Mrs. Selo and Mr. and Mrs. Levites at the telephone numbers that he had for them.

Soon after that, Mr. Selo received a telephone call from Mr. Levites, who asked him to come to the house.  When Mr. Selo arrived, Mr. Levites handed Mr. Selo an envelope containing divorce papers.  On August 15, 2012, Mr. Selo was served with process in the Livingston County divorce and custody action by Mrs. Selo's father at the Levites' home in Brighton, Michigan.  (Jt. Stip. Facts at ¶ 25).  Mr. Selo was very upset.  He believed that he and his wife were still working on saving their marriage.

Mr. Selo went back to his hotel and contacted Mrs. Selo via e-mail and telephone.  Mr. Selo communicated that he no longer agreed to JPS remaining in the United States.  Mr. Selo looked up information on the internet regarding child abductions and the Hague Convention.  He then began looking for a Michigan lawyer via the internet.  Mr. Selo attempted to contact two attorneys in Michigan but could not reach them.

On August 15, 2012, Mrs. Selo filed a motion in the Livingston County divorce case requesting full legal and physical custody of JPS with Mr. Selo to have parenting time only in

Michigan.  (Jt. Stip. Facts at ¶ 24).

Mr. Selo returned to Switzerland on August 17, 2012.  After he returned to Switzerland, Mr. Selo contacted the Central Authority of Switzerland and began gathering documents in order to submit a Hague Application Form.  He initially tried to file it on August 19, 2012, but was told that he needed additional documents.  Mr. Selo's Hague Application Form was signed by Swiss Central Authority in Switzerland on August 24, 2012.  (Jt. Stip. Facts at ¶ 26).

Mr. Selo initiated this action on September 25, 2012, by filing his Petition for Return of Child.

In November of 2012, JPS saw Dr. Cotts again at the University of Michigan Hospital. (Jt. Stip. Facts at ¶ 16).

Mr. Selo still resides at the marital residence in Switzerland.  (Jt. Stip. Facts at ¶ 21).

Mrs. Selo and JPS are still residing with Mrs. Selo's parents, David and Karen Levites, at 1046 Fairway Trails Drive, Brighton, Michigan.  (Jt. Stip. Facts at ¶ 22).  Thus, JPS has now been in the United States for more than two years.

As of August 14, 2012, JPS had been living in the United States continuously for more than eighteen months.  He had not traveled back to Switzerland at any point.  JPS has become very close with his maternal grandparents, David and Karen Levites, since coming to live with them in February of 2011.  JPS has spent time with his grandparents on a daily basis.  JPS plays chess and board games with them, and helps them around the house and in taking care of the yard.  JPS attends sporting events with Mr. Levites and plays basketball with him in the driveway.

Mrs. Selo's sister Kim lives in Michigan and also sees JPS on a regular basis.  They

12

typically meet up on the weekends and engage in activities such as bowling, miniature golf, and shopping.

JPS also has friends in the neighborhood and through school and extracurricular activities. JPS's closest friend is a boy named Joe who lives very close to the Levites residence in Brighton.

JPS has also gone on various outings and excursions while in the United States, including outings to Kensington Park, the Detroit Zoo, Comerica Park, the local cider mill, and the Michigan Renaissance Festival. (Resp. Ex. 3).

## ANALYSIS & CONCLUSIONS OF LAW

**1.  It Is Undisputed That JPS Is Currently In The United States, That The Treaty Is In Force Between The United States And Switzerland, And That JPS Is Under The Age Of Sixteen.**

It is undisputed that the minor child, JPS, is presently in the United States and that JPS is under the age of sixteen years old. It is also undisputed that both Switzerland and the United States are signatories to the Hague Convention. Thus, the Treaty is in force between Switzerland and the United States and this Court may therefore proceed to determine the merits of the Petition.

**2.  The Court Reject's Mrs. Selo's Position That There Has Been No Retention At All Because Mr. Selo Consented To JPS Residing In The United States On A Permanent Basis.**

As both parties now[2] agree, this is not a case of an alleged wrongful *removal* of a minor child. Rather, Mr. Selo alleges that Mrs. Selo wrongfully retained JPS in the United States

---

[2]The Petition was not confined to retention. But as shown by the Joint Stipulation of Facts, and the evidence presented at the evidentiary hearing, Mr. Selo consented to Mrs. Selo bringing JPS to the United States. Thus, there was no wrongful removal.

although his habitual residence is in Switzerland.

Mrs. Selo's first argument is that the Court should find that there has been no retention of the child at all because Mr. Selo consented to JPS remaining in the United States on a permanent basis. The Court rejects that position because the evidence reflects that Mr. Selo never consented to having JPS reside in the United States on a permanent basis.

Having rejected that argument, the Court will proceed to determine whether Mr. Selo has established a prima facie case of wrongful retention.

3.     **The Court Must Determine If Mr. Selo Has Established A Prima Facie Case Of Wrongful Retention Under The Convention.**

Mr. Selo, as the petitioning party, has the burden of showing by a preponderance of the evidence that the retention here was wrongful under the Hague Convention. *Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007); *Friedrich I,* 983 F.3d at 1400.

A petitioner cannot claim that a retention of a child is "wrongful" under the Hague Convention unless the child to whom the petitioner relates was "habitually resident" in a State signatory to the Convention and was retained in a different state. *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). Thus, in order to evaluate whether a petitioner has established a prima facie case of wrongful retention under the Convention, the Court must determine: 1) when the removal or retention at issue took place; 2) where was the minor child's habitual residence immediately prior to the removal or retention; 3) whether the retention breached the rights of custody attributed to the petitioner; and 4) whether the petitioner was exercising those rights at the time of the removal or retention. *Id.*

To establish a wrongful retention, Mr. Selo must prove that: 1) JPS was wrongfully

14

retained in the United States; 2) JPS's habitual residence was Switzerland immediately prior to

such retention; 3) the retention breached his custody rights; and 4) Mr. Selo was exercising his

custody rights at the time of the retention.

If Mr. Selo can establish a prima facie case of wrongful retention under the Hague

Convention, then the burden shifts to Mrs. Selo to demonstrate an exception to the general rule

that a wrongfully retained child must be returned to the child's country of habitual residence.

**4.     It Is Undisputed That Mr. Selo Had Rights Of Custody And Was Exercising Those Rights.**

Here, it is undisputed that Mr. Selo had rights of custody and was exercising those rights

prior to the alleged retention (*see* Resp.'s Trial Brief at 10, stating "[i]t is not disputed that under

Swiss law, the Father has rights of custody to the child.  It is also not disputed that the Father has

always exercised his rights to the child.").  Accordingly, only the first two issues must be

resolved by this Court.

**5.     The Retention By Mrs. Selo Began On August 15,  2012.**

The first issue this Court must determine is "when the retention began."  *Walker v.

Walker*, 701 F. 3d 1110, 1118 (7th Cir. 2012).

The case law reflects in cases where the petitioning parent initially gave consent for the

child to travel to another country for some period of time, a "retention" does not begin until the

non-custodial parent clearly communicates his or her desire to regain custody and asserts his or

her parental right to have the child returned.  *See Karkkainen*, 445 F.3d at 290; *Slagenweit v.

Slagenweit*, 841 F.Supp. 264, 270 (N.D. Iowa 1993); *Ramirez v. Buyauskas*, __ F.Supp.2d __,

2012 WL 606746 (E.D. Penn. 2012); *Mitsuing v. Lowry*, 2010 WL 1610418 (E.D. Mo. 2010).

15

That is, a "retention" occurs following an agreed upon period of time for a child to visit another country only when the non-custodial parent communicates that he or she no longer consents to the child remaining in that country.

In this case, there was no retention of JPS in the United States by Mrs. Selo until August 15, 2012 when Mr. Selo clearly communicated to Mrs. Selo that he no longer consented to JPS remaining in the United States and took actions to regain custody and have JPS returned to Switzerland. Thus, because August 14, 2012, was the last date upon which JPS was present in the United States with Mr. Selo's permission, the retention began on August 15, 2012.

**6.     The Court Must Next Determine Where JPS's "Habitual Residence" Was In August Of 2012.**

Once the Court determines the date when the retention began, the Court must next determine where JPS's "habitual residence" was just prior to that date. Thus, this Court must determine where JPS's habitual residence was just prior to August 15, 2012.

Mr. Selo, as the petitioning party, has the burden of showing, by preponderance of the evidence, that JPS's habitual residence was still Switzerland at that time in order to establish a prima facie case of wrongful retention. *Robert,* 507 F.3d at 993-95; *Roche v. Hartz*, 783 F.Supp.2d 995, 1001 (N.D. Ohio 2011).

**7.     This Court Must Follow The Sixth Circuit's Standards For Determining A Child's Habitual Residence**

The Hague Convention does not define the term "habitual residence." *Friedrich I,* 983 F.2d at 1400. *Friedrich I* was the first time the Sixth Circuit considered the issue. In that case, the Sixth Circuit explained that "there is no real distinction between ordinary residence and habitual residence." *Id*. at 1401.

Although the facts presented in *Friedrich I* reflected a rather "simple case," a later Sixth Circuit decision explained that *Friedrich I* nevertheless "provides five principles" regarding habitual residence which must guide "more complicated decisions." *Robert ,* 507 F.3d at 989 (6th Cir. 2007). "First, habitual residence should not be determined though the 'technical' rules governing legal residence or common law domicile. Instead, courts should look closely at '[t]he facts and circumstances of each case.'" *Robert,* 507 F.3d at 989 (quoting *Friedrich I)*. "Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence." *Id.* "Third, this inquiry should focus exclusively on the child's 'past experience.' 'Any future plans' that the parents may have 'are irrelevant to our inquiry.'" *Id.* "Fourth, '[a] person can have only one habitual residence.'" *Id*. Fifth and [f]inally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only 'a change in geography and the passage of time' may combine to establish a new habitual residence." *Id.*

In *Robert*, the Sixth Circuit recognized that some of its sister Circuits had "parted ways" with the standards set forth in *Friedrich I*' and "[r]ather than limiting their inquiry to *Friedrich I's* five guiding principles, these Circuits have introduced an additional factor: the subjective intent of the parents." *Robert*, 507 F.3d at 989. It explained that one such case is the Ninth Circuit's decision in *Mozes v. Mozes*, 239. F3d 1067 (9th Cir. 2001.), which held that the subject intentions of the parents are nearly dispositive of a child's habitual residence. *Robert,* 507 F.3d at 990. The *Robert* court noted that the *Mozes* court concluded that "'where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period . . . courts have generally refused to find that the changed intentions of one

17

parent led to an alteration in the child's habitual residence.'" *Id.* (quoting *Mozes, supra*). In *Robert*, however, the Sixth Circuit concluded that *Mozes* is *incompatible* with the standards set forth in *Friedrich I* and it clearly *rejected* the standards set forth in *Mozes*. *Robert*, 507 F.3d at 989-992.

Although the *Robert* court concluded that *Mozes* was inconsistent with *Friedrich I*, it determined that "not all post-*Friedrich I* developments should be rejected by the Sixth Circuit." *Id.* at 992. After reviewing some post-*Friedrich I* cases, the *Robert* court ultimately set forth the proper standard, given the developments which it accepted:

> [W]e hold that child's habitual residence is the nation where, at the time of their removal [or retention], the child had been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.' *Feder*, 63 F.3d at 224. Such a holding is not only consistent with the collective wisdom of many of our sister Circuits, but it is also consistent with *Friedrich I's* holding that a habitual residence inquiry must 'focus on the child, not the parents, and examine past experience, not future intentions." 983 F.2d at 1401.

*Robert,* 507 F.3d at 993.

There are several factual circumstances which a court should consider in determining whether or not a child's stay in a new country meets the tests of "acclimatization," and "settled purpose." *Id.* at 996. Academic activities are among the most central in a child's life and are therefore highly suggestive of acclimatization. *Id.* (citing *Karkkainaen, supra*, at 293). Other factors to be considered include participation in sports programs and excursions and meaningful connections with the people and places in the child's new country.

18

8.     **Mr. Selo's Reliance On *Blanc* Is Misplaced Because That Decision Improperly Relied On The Habitual Residence Standards Set Forth In *Mozes* – Which Have Been Expressly Rejected By The Sixth Circuit.**

Mrs. Selo contends that JPS's habitual residence had shifted to the United States by the date of any retention.

In response, Mr. Selo asserts that Mrs. Selo's position should be rejected because a "unilateral decision" by one parent does not change the child's habitual residence. (Pet.'s Tr. Br. at 13). Mr. Selo asserts that the Court should look to the subjective intentions of the parents, and particularly, the "last shared intent of the parents", in order to determine the child's habitual residence. Mr. Selo directs the Court to *Blanc v. Morgan*, 721 F.Supp.2d 749 (W.D. Tenn. 2010). In that case, which was decided after the Sixth Circuit's decision in *Robert,* the trial court relied on *Mozes* and examined the subjective intentions of the parents in determining the child's habitual residence at the time of the wrongful retention. As at least one other district court within the Sixth Circuit has recognized, however, the district court in *Blanc* erred in following *Mozes* and examining the subjective intent of the parents because the Sixth Circuit had already expressly rejected *Mozes*. *Roche*, 783 F.Supp.2d at 1002-03.

This Court is bound to follow Sixth Circuit authority and that authority makes clear that this Court *cannot* look to the subjective intentions of the parents in determining the child's habitual residence. *Robert,* 507 F.3d at 989-92.

9.     **Applying The Appropriate Standard, This Court Finds, By A Preponderance Of The Evidence, That JPS's Habitual Residence Was In The United States On August 14, 2012.**

It is undisputed that JPS's habitual residence was Switzerland in February of 2011. The question then becomes whether his habitual residence had altered to the United States by August

19

of 2012.  For the reasons below, the Court concludes that it had.

A child's habitual residence may be altered "only by a change in geography and the passage of time." *Friedrich I*, 983 F.2d at 1402.  And the change in geography must have occurred before the questionable removal or retention.  *Id.*

Here, the change in geography occurred prior to any wrongful retention by Mrs. Selo. The change in geography occurred on February 13, 2011, when Mrs. Selo and JPS came to the United States, with Mr. Selo's consent.  And both parents later agreed that JPS could remain in the United States with Mrs. Selo for an undetermined period of time, while Mr. and Mrs. Selo lived apart and separately received counseling.  It was not until August 15, 2012, that Mrs. Selo's retention of JPS in the United States was without Mr. Selo's consent.  But by that time, JPS had been living continuously in the United States for more than eighteen months.  This rather extensive passage of time, when viewed from the child's perspective, altered JPS's habitual residence.

The Sixth Circuit considers a child's habitual residence to be "the nation where, at the time of [a wrongful retention], the child has been present long enough to allow acclimatization, and there this presence has a degree of settled purpose from the child's perspective." *Robert,* 507 F.3d at 993.

Academic activities are among the most central in a child's daily life and consideration of this factor here weighs in favor of the United States being JPS' habitual residence as of August 14, 2012.  By August of 2012, JPS had participated in a home-schooling program through a local organization in Michigan for nearly eighteen months.  Through that organization, JPS participated in a home-school co-op program where he spends time attending classes at the

organization and engages with other children in the program.  He has also participated in a

theater program.  While Mrs. Selo serves as JPS's primary instructor when he is at home, JPS

also has a tutor in Michigan.  Notably, JPS has been speaking English, and writing in English,

since arriving in the United States.

JPS has also established meaningful relationships with his relatives in the United States

that weigh in favor of the United States as his habitual residence.  Again, as of August 14, 2012,

JPS had been living in the United States continuously for more than eighteen months.  Not

surprisingly, JPS has become very close with his maternal grandparents, David and Karen

Levites, since coming to live with them in February of 2011.  JPS has spent time with his

grandparents on a daily basis.  JPS plays chess and board games with them, and helps them

around the house and in taking care of the yard.  JPS attends sporting events with Mr. Levites and

plays basketball with him in the driveway.  JPS has also been spending time with Mrs. Selo's

sister Kim (his aunt) on a regular basis.  They typically meet up on the weekends and engage in

activities such as bowling, miniature golf, and shopping.

In addition, JPS also has friends in the neighborhood and through school and

extracurricular activities.  JPS's best friend is a boy named Joe who lives very close to the

Levites residence in Brighton.

JPS now has a cardiologist in Michigan who he has seen multiple times and with whom

he now has an established patient relationship.

JPS has his own bedroom at the Levites residence in Brighton, Michigan and it is a

typical bedroom of a child his age.  That is, his bedroom contains a bed and other furniture,

including a desk.  It also contains a television, a computer, his DVDs and other possessions, and

his toys.  The walls of JPS's bedroom are decorated with various posters that he has chosen.  By August of 2012, the Levites residence had become the place that JPS considers "home."

Further contributing to his socialization in the United States, JPS has gone on various outings and excursions while in the United States, such as the trip to Las Vegas in November of 2011, and more local trips such as outings to Kensington Park, the Detroit Zoo, the local cider mill, and the Michigan Renaissance Festival.

This United States-centered experience contrasts dramatically with JPS's lack of contact with Switzerland during this time period.  After arriving in the United States on February 13, 2011, JPS has never returned to Switzerland    not even for a visit.  And from the time period from February 13, 2011, to August 14, 2012, JPS saw his father only two times, in November and December of 2011, when Mr. Selo came to the United States for visits of approximately a week.

In sum, over a period of more than eighteen months, JPS became more and more socialized in the United States, such that his habitual residence as of August of 2012 was the United States.

Accordingly, after applying the standards set forth by the Sixth Circuit,[3] this Court finds, by a preponderance of the evidence, that by August of 2012, JPS was a habitual resident of the United States.

_____

[3]The Court notes that even if it were free to follow the standards set forth in *Mozes* (which it is not), this Court would still come to the same conclusion    that the United States was JPS's habitual residence in August of 2012.  Even the *Mozes* court recognized that "if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior residence.  A parent who agrees to such an arrangement without any clear limitations may well be held to have accepted this eventuality."  *Mozes*, 239 F.3d at 1082.

22

10.     **Because Mr. Selo Has Not Established A Prima Facie Case Of Removal, The Petition Must Be Denied And No Further Analysis Is Required**.

Because Mr. Selo has not met his burden of establishing that JPS's habitual residence was Switzerland immediately prior to the retention, he has failed to establish a prima facie case of wrongful retention under the Hague Convention. *Robert*, 507 F.3d at 998; *Roche*, 783 F.Supp.2d at 1002. This Court must therefore deny the Petition and no further analysis is required.

## CONCLUSION & ORDER

For the reasons set forth above, **IT IS ORDERED** that the Petition for Return of Child is **DENIED.**[4]

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 8, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 8, 2013, by electronic and/or ordinary mail.

S/J. McCoy
Case Manager

---

[4]Petitioner's request for an award of fees and costs pursuant to 42 U.S.C. § 11607 is therefore denied as moot.

23